**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **Stephanie Y. Brown** | ) |
| | ) |
|         **Plaintiff,** | ) **Case No. 1:12-cv-00799-RJL** |
| **v.** | ) |
| | ) |
| **University of the District** | ) |
| **of Columbia, et al.** | ) |
| | ) |
|         **Defendants.** | ) |
| | ) |
| _____ | ) |

**AMENDED COMPLAINT FOR DAMAGES**

**COMES NOW** Plaintiff, Stephanie Yvonne Brown, by and through undersigned counsel, and respectfully files this civil action against the University of the District of Columbia, (David A. Clarke School of Law or "DCSL"), the University of the District of Columbia Board of Trustees and the University of the District of Columbia's President, Allen Sessoms based upon, breach of contract, breach of the covenant of good faith and fair dealing, race and gender discrimination, negligent supervision and negligent infliction of emotional distress.  For cause, Plaintiff states the following:

**JURISDICTION AND VENUE**

This court has original subject matter jurisdiction by virtue of D.C. Code § 11-921. Venue exists as Plaintiff resides and conducts business in the District of Columbia ("D.C.") and the events complained of occurred in D.C.   Plaintiff's claims are brought here pursuant to DC Human Rights Act, and certain common law claims.

## PARTIES

1. Plaintiff, Stephanie Yvonne Brown ("Brown" or "Professor Brown") is an African-American woman and D.C. resident.  Professor Brown has devoted the last twenty-five (25) years of her life to the survival and development of U.D.C.'s David A. Clarke School of Law ("UDCSL-DCSL and its predecessor institution").   She has been associated with UDCSL in multiple professional capacities since 1988, including serving as its day-to-day Administrator, Chief Financial Officer, and member of its law faculty.  As a law faculty member, she's taught Torts, Property, Wills and Estates, among other courses.

2. Defendant University of the District of Columbia ("UDC") is a independent agency of the District of Columbia government  that controls and operates the DCSL. DCSL is managed and governed by its Board of Trustees ("Board"). Defendant  Board is responsible for managing its President and other executive officials, including its Provost and Dean of the David A. Clarke School of Law. Dean Katherine S. ("Shelley") Broderick ("Broderick") is Dean of the law school.

3. Defendant Allen Sessoms ("Sessoms") is President of the University of the District of Columbia; he is being sued in his individual and official capacities.

4. A 12-309 notice has been timely served upon the D.C. government.

## FACTS COMMON TO ALL CLAIMS

5. In 1995, the law school merged with the University of the District of Columbia ("UDC") and the parties entered into a Merger Agreement, which terms and conditions in part governs the dispute herein. ("UDC").   Accordingly, the two (2) entities were and are governed by an executed Merger Agreement dated November

2

14, 1995.  (Incorporated by reference).  The Agreement transferred authority of the law school from its Board of Governors to the UDC Board of Trustees.

Prior to the Merger, the award of tenure to law faculty was granted by the law school's Board of Governors.   The Agreement provides:

 "Law Faculty Appointment and Service," the law school faculty shall adopt written criteria for determining whether to award tenure to a member of the faculty."

6.   The Agreement further reads in pertinent part:  It is the intent of the parties that the Board of Trustees of the University operates a law school with the same existing threshold as the existing D.C. School of Law.  Moreover,  the UDC School of Law will operate under the guidance of the Board of Trustees of the University of the District of Columbia under the authority set forth in DC Code, Section 31-1516(2)(C).

7.   The Agreement further indicates that the provisions of existing DCSL personnel rules, as set forth in Chapter 14 of Title 8A DCMR, will become the University rules applicable to law school faculty appointment and service.

8.   The Agreement, in that same section, states: The provisions of Chapter 14 of the DCSL Rules *shall be amended* to provide for the Dean to forward recommendations for promotion and tenure to the President of the University through the Provost and President for final approval by the Board of Trustees. (Emphasis added).

9.  As of the date of this amended complaint, no such amendment has been promulgated.  Nor can the Board, absent such an amendment, legally delegate its decisional authority related to tenure to either the University President or its Provost.  Hence, by law, final approval of tenure applications still rests with the University Board of Trustees.

10. The Agreement and Chapter 14 of Title 8A DCMR should also be read in conjunction with the Faculty Handbook ("Handbook") which constitutes the term and condition of a binding contract between law faculty members and the law school.

11.  The Handbook, by its own language, is intended to state policies, responsibilities, relationships, and procedures in sufficient detail to enable faculty members at UDC-DCSL to know different aspects of the institution that bear on their duties, responsibilities, and opportunities, as teachers.   Further, the Handbook was updated and reissued on March 13, 2000 to incorporate the merger with UDC among other things.   It was revised by the faculty on April 3 and May 29, 2002 and formally adopted and approved by the Board of Trustees on June 18, 2002. See Faculty Handbook at i.   The Faculty Handbook also refelects certain well founded and well established contractual practices including, but not limited to, the practice that Law Faculty will review tenure and submit tenure applications to the Law School Dean, and further that the Board of Trustees will enjoy final decision making authority on all tenure applications.

12. In the Handbook at pages 12-15 at C., General Statement and Criteria Regarding Tenure and Promotion, the law school states its criteria for Promotion and Tenure. Conspicuously absent is any reference to either the University Provost or President having any authority or role in the faculty tenure consideration process. The Handbook is consistent with the state of applicable law.

13. Neither the President nor Provost, pursuant to the Merger Agreement nor any applicable law, have a legal right to finalize a law school faculty tenure decision. DCMR Title 8-A1423, specifically regarding Law School Faculty Appointment and Service, states that tenure recommendations shall be forwarded *only* to the Dean. (Emphasis added). That provision has not been amended. Consitent with the Board of Trustee's governance obligations, and University custom and practice regarding each and every considered and approved tenure application to date, the Law School Faculty Evaluation and Retention Committee "(FERC")" is charged with the responsibility to review *faculty* applications for tenure and to make recommendations to the Board of Trustees for its final approval. Tenure applications have been transmitted to the Provost and/or University President as a mere formality.

14. On January 5, 2009 Professor Brown applied for tenure and promotion as full professor. On May 14, 2009, FERC, under the direction of its then chairman, Robert Burgdorf, Jr. ("Burgdorf"), after careful examination voted unanimously in favor of Professor Brown's Application for Tenure. Its recommendation was transmitted to Dean Broderick. FERC's membership includes all tenured faculty, except the Dean.

15. The law school has adopted three (3) distinct qualifications for tenure: teaching, scholarship and service.

16. Upon receipt of FERC's recommendation regarding Professor Brown, Dean Broderick expressed several concerns, which FERC's chairman and Plaintiff questioned.

17. Dean Broderick initially suggested that FERC withdraw its recommendation of Brown, which met with a swift detailed seven (7) page response from FERC's Chairman Burghauf.  He stated in pertinent part as follows: ".... Professor Brown has made the requisite significant contributions to the growth and understanding of the law." He elaborated that "[h]er application includes three scholarly works, one previously published, one accepted for publication, and another work-in-progress that has the potential to contribute to the growth and understanding of the law." He then underscored FERC's Report and Professor Brown's significant contributions to the law school's development:  "Professor Brown was a mainstay at the School of Law for many years prior to joining the faculty, indeed from its beginning."  He noted that she served as Executive Assistant to the Interim Board of Governors, Special Assistant to the Dean of the law school, and Associate Dean for Administration and handled all sorts of thankless tasks, among other things, "recruiting additional staff and organizing the fledgling school "addressing "budget  and finance, [personnel, and facilities" responsibilities and even "fend[ing] off attempts to abolish the  law school by the United States House of Representatives, the Senate, the Mayor, and the D.C. City Council."

18. FERC's extensive assessment of Professor Brown's service record, which accentuated her academic record, ended with this comment:  "Associate Dean Brown's steady hand on the helm of administrative matters was a key factor in the law school's ability to survive these many threats.   **This extraordinary service is an important part of the context for consideration of her application for tenure**."   Citing" Report to FERC from the FERC Evaluation Subcommittee Recommending Tenure for Associate Professor Stephanie Y. Brown, p. 2 (Emphasis added by FERC).

19. Prior to the submission of Professor Brown's tenure application to former Provost Grace Baxter ("Baxter"), Dean Broderick commented about Provost Baxter's likely reaction to FERC's tenure recommendation, thereby implying that she and the Provost had discussed FERC's recommendation in some detail.

20. Notably, Dean Broderick's concerns were directed to Plaintiff's then one (1) published law review article and two (2) pending law review articles and why "FERC believes that normal standards do not apply."[1]

21. On October 14, 2009, the St. John's University School of Law,  Journal of Civil Rights and Economic Development, offered and agreed to publish Professor Brown's law review article in its official journal of The Ronald H. Brown Center for Civil Rights and Economic Development.

---

[1] / It is instructive that Dean Broderick at no time questioned why standard tenure criteria had not been applied by FERC  to a similarly situated white male law professor who had not published any law review articles.  Nor did Dean Broderick insist upon  application of the same law review criteria  for the white male law professor.   Hence,  Professor Brown, an African-American woman law professor, had to be twice as qualified as her similarly situated white male colleague, who wrote no law review articles to justify tenure.

22. On October 30, 2009 FERC wrote to Dean Broderick and updated Brown's tenure application, to include the announced publication of her law review article in the aforementioned St. John's Journal.

23. On December 8, 2009, DCSL Dean Shelly Broderick ("Broderick") wrote to the University's Provost and Vice President Baxter and "unequivocally" endorsed FERC's unanimous recommendation stating as follows: "The Committee's assessment of Professor Brown's teaching is extensively detailed, and its conclusions about her competence in this area comport well with my personal knowledge of her effective and mission-driven teaching."  Among other things, Broderick noted that FERC's description of Professor Brown's extraordinary service in her position as Associate Dean since 1987 through 2003 is an important part of the context for consideration of her application for tenure."   Dean Broderick further concurred with FERC's conclusion and the external reviews of Professor Brown's articles.

24. The Dean, upon information and belief, transmitted FERC's recommendation to Interim Provost Baxter.  However, Baxter refused to act on the recommendation for nearly 18 months even though she had no authority to act thereupon, according to the applicable DCMR and the Faculty Handbook. Said delay impeded Plaintiff's rights to be duly considered by the University Board of Trustees consistent with applicable law.

25. On July 3, 2010, Professor Susan Waysdorf ("Waysdorf") notified Professor Brown that she would be serving as the FERC Chair for the 2010-2011 academic years. As of that date, the Provost had not responded to Brown's tenure application. Broderick reported Provost Baxter's dissatisfaction with said tenure application based on the fact that articles accepted for publication were in editorial review.

26. In May 2011, 17 months after Dean Broderick's unequivocal endorsement of Plaintiff's application, several FERC members wrote Baxter.  Once again, they underscored Brown's accomplishments and urged that she support FERC and the Dean's tenure recommendations.

27. Baxter, however, rejected Brown's tenure application, giving her a terminal year concluding Academic year 2011-2012 in a June 2011 letter.  Any action taken by Baxter was illegal and outside of her authority, including her provision of a terminal date to Plaintiff.   At best, she could only voice her recommendation as a mere formality.  Further, the University Board of Trustees and its president should have ensured that the Provost and all other University Officials acted in accordance with applicable law.  They did not.

28.  It is unclear as to what information Baxter relied upon in justifying her action and purported decision, except notably Dean Broderick's initial communications with her.

29. At some point thereafter, Baxter informed Professor Brown, in writing, that she had referred the tenure matter to the University President.   This further delayed

due consideration by the Board of Trustees of Brown's application for tenure and a full professorship.

30. On October 26, 2011 five (5) months later, and more than two (2) years and four (4) months since FERC's May 2009 recommendation, University President Allen Sessoms ("Sessoms") decided not to forward the application to the Board of Trustees, thereby making a final decision on the application.  In so doing, he stated as follows:  "*As to the process, I do not believe that applications for tenure which I do not support should go to the Board*.  That has not been my experience in other institutions and such has not been the practice at the University of the District of Columbia."  The President took no action on the matter of promotion

31. His view and conclusion was totally subjective and absent any legal authority whatsoever as per either the D.C. Code, D.C. Municipal Regulations, the Merger Agreement, and/or the Faculty Handbook.   Moreover, his legal authority in this instance is not governed by Defendant Sessom's practices at other universities.

32.  President Sessoms's pronouncement and action violates applicable law, to wit, the law provides that authority over the School of Law is vested in the UDC Board of Trustees, not the University President.   Consistent therewith, all prior final tenure decisions have been made by the Board, not the President.

33. President Sessoms noted that his decision was consistent with his practice in other Universities, which is of no moment to the state of law in the District of Columbia. The UDC Board should not have allowed the President to govern its decisions relative to the DCSL based on subjective past experiences. .

34. President Sessoms further indicated that he consulted with the University's General Counsel who erroneously advised him that his decision was consistent with the Merger Agreement, which appeared to have given him "final approval" of tenure decisions.  It does not do so.

35. Defendant Sessoms and his General Counsel erroneously read the Merger Agreement in a manner that conveniently omitted its conditionality, to wit, the required amending of Title 14.   Indeed, the Merger Agreement alone could not effectuate the needed regulatory reform and changes which the plain meaning of the Agreement anticipated.

36. Hence, the President does not and has never enjoyed legal authority to make recommendations, nevertheless final authority over law school tenure decisions. Accordingly, President Sessoms had no legal authority to consider Plaintiff's tenure application, delay its consideration, make a recommendation, or a final decision thereupon.  The law, the Merger Agreement, and the Faculty Handbook, when read conjunctively and literally require FERC and the Dean's recommendation(s) only,  until such time as  the law at DCMR is amended, as anticipated.

37. As a result of their joint and several misreading of applicable law, President Sessoms and Interim Provost Baxter, unreasonably and illegally delayed and impeded Plaintiff's tenure application and denied Plaintiff tenure in violation of applicable regulations, the Agreement and the Faculty Handbook.  Further, the University's governing Board allowed and sanctioned their illegal actions and continue to do so through May 2012.

38. To date, Defendant Sessoms and Provost Baxter's  actions have resulted in the UDC Board of Trustees not receiving, even to this date, FERC's and Dean Broderick's formal recommendation of Professor Brown's tenure.  As a result, they have deprived Plaintiff of the consideration of tenure to which she is entitled by law.

39. President Sessoms also illegally denied Plaintiff a promotion to full professor, a decision which he had no authority to make.

40. Defendants has thus breached the terms of the Merger Agreement and the Faculty Handbook, as well as its duty of good faith and fair dealing.

41. President Sessoms owed Plaintiff a duty to follow applicable law and the Faculty Handbook, to not usurp the Board of Trustee's authority, nor deprive Plaintiff of timely consideration of FERC and the Dean's favorable recommendation of her tenure application.

42. The UDC Board abrogated its duties and responsibilities in failing to supervise President Sessoms and to ensure that he not make decisions reserved by law to the Board.   The Board further failed to exercise due oversight to ensure that its executive officials act in accordance with the law and the Faculty Handbook.

43.  To date, having deferred to president Sessoms, Defendant UDC and its Board of Trustees have failed to make a final decision regarding her tenure and promotion to full professorship in accordance with applicable law, the Merger Agreement and the Faculty Handbook.

44. Defendant UDC, through its  University Provost and President, subjected Plaintiff to an illegal tenure review process, as well as an illegal double standard, one which was substantially higher than that which it  applied to William G. McLain ("McLain"), a white male law professor with no legal publications.

45. Even Dean Broderick insisted that Plaintiff comply with the academic publication criteria in order to justify her support for Plaintiff's tenure application. She did not impose the same standard on McLain.

46. In 2010 the Board of Trustees approved UDC Resolution No. 2010 ("Resolution"), which awarded tenure and promotion to full professor to Law Professor McLain.

47. That resolution is instructive and reads in pertinent part:

 NOW, THEREFORE, BE IT RESOLVED that the Board of Trustees of the University of the District of Columbia *approves the award of tenure at the rank of full professor to Professor William McLain of the UDC David A. Clarke School of Law.*

48. Resolution 2010 also confirms that final authority for awarding tenure to law professors is vested in the UDC Board.

49. By comparison, McLain, the similarly situated white male law professor, had not published the requisite three (3) law review articles.  In lieu thereof, he was credited for his various and sundry legal contributions.

50. On the other hand, Plaintiff demonstrated academic accomplishments and a record of selfless and thankless contributions to the law school.  She was required to meet both public service and simultaneously satisfy academic requirements in order to be favorably considered by FERC and Broderick, thereby subject to the typical

double standard rooted in the history of race discrimination in American jurisprudence.

51. Plaintiff was equally, if not more qualified than McLain, based upon applicable tenure criteria, to be favorably considered by the UDC Board, which should have decided her application several years ago.

52. In addition to qualifications and that its actions to date are illegal; Defendant UDC can demonstrate no legitimate business justification for denying Plaintiff tenure or failing to promote her to full professorship.

53. The very University that speaks so valiantly of equal rights and equal justice at its law school has violated District of Columbia law, its own guidelines and contracts and thus the rights of one of its most acclaimed and selfless faculty.

54. But for Plaintiff being an African-American woman, a suspect class unto itself, she would not have been held to a higher double standard. Nor would the Provost and University President, who were acting without legal authority, have delayed and obfuscated her tenure consideration process and denied her tenure application.

55. By letter dated May 2, 2012, Defendant's Provost advised Professor Brown that "pursuant to the David A. Clarke's School of Law's Faculty Handbook" termination of her employment should have occurred on December 31, 2011." Plaintiff was further notified that her employment with Defendant ended on May 15, 2012.

56. Notwithstanding this May 2, 2012 letter and the University's admitted error, Brown administered law school examinations on May 2, 2012 and by policy and practice, has thirty (30) days from that date, or until about June 2, 2012 to render

final grades.  No termination should properly occur under these circumstances in the middle of the final exam grading process.

57. By virtue of Defendants' actions, Brown has experienced significant emotional and mental anguish.

58.  Plaintiff asserts *respondeat superior* where applicable, to include the action of the University's Board and Provosts.


**COUNT I**
**BREACH OF CONTRACT**
**University of the District of Columbia (UDC) and Board**

59. Paragraphs 1 through 58 are fully incorporated as if set forth full herein.

60. Defendant UDC failed to act in accordance with the the  Faculty Handbook, which incorporates the Merger Agreement.  Further the contract rights in the Handbook are well known, uniform  and clearly established in the Defendant UDC's customs, practices and policies, to wit that all law faculty tenure applications are subject to FERC review and consideration;  [2] that is makes recommendations to the law school Dean; and that final decisions regarding tenure approval have been made by the Board of Trustees.   Defendants breached Plaintiff's contractual rights by allowing the Provost and its President to impede Plaintiff's tenure review and promotion process, and ultimately preclude its Board of Trustees from consideration of Plaintiff's tenure application and FERC's favorable recommendation thereof.

---

[2] / The DCSL has a Faculty Policies Publication which states its practice regarding tenure.  Said practice mirrors the Faculty Handbook's provisions on tenure.

61. Dean Broderick should have acknowledged that the the President, by law, did not have final authority to approve tenure applications.   Further, she should have advised the Board and President Sessoms of the state of the law and  that any final consideration by the Provost and/or the President of Plaintiff's tenure and promotion application was prohibited.   She did not.

62. Dean Broderick, President Sessoms and the present and former Provosts' respective actions breached Plaintiff's contract with Defendant UDC, to wit, they violated the Handbook's (which expressly incorporated the Merger Agreement). The Handbook did not give  President Sessoms final authority over law faculty tenure.

63. Plaintiff suffered considerable economic harm as a result of Defendant UDC's breach of its contract, including loss wages, loss promotion, back and front pay, and other benefits.

**WHEREFORE,** Plaintiff respectfully prays this Honorable Court enter judgment against Defendants as follows:

(a)  damages in an amount in excess of $1,000,000.00;

(b) economic damages in an amount in excess of $250,000.00;

(c) Such other equitable, injunctive and other relief that this court deems appropriate including, but not limited to reinstatement, and an order that the Board of Trustees consider Plaintiff's tenure application, and attorneys' fees and cost.

**COUNT II**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
<u>**University of the District of Columbia  (UDC) and Board**</u>

64. The allegations set forth in Paragraphs 1-63 are fully incorporated as if set forth more fully herein.

65. Defendant UDC owes Plaintiff the duty of honesty, good faith and fair dealing, which it breached when it intentionally impeded and delayed consideration of Plaintiff's applications for tenure and full professorship and allowed the UDC President to make a final tenure decision in violation of applicable law. Defendant's actions effectively defied Defendant's tenure consideration process and deliberately deprived Plaintiff of timely, objective and unbiased consideration for tenure and promotion.

66. At all times referenced herein, Defendant continuously failed to timely respond to Plaintiff's and FERC's request for a tenure decision, and further deprived Defendant's Board of its right to dutifully consider Plaintiff's application for tenure and full professorship.

67. As a result of Defendant's breach of its covenant of good faith and fair dealing, Plaintiff has suffered economic damages in an amount to be determined more specifically at a trial on the merits.

**WHEREFORE** Plaintiff respectfully prays this Honorable Court enter judgment against Defendant UDC as follows:

(a) compensatory damages in an amount in excess of $1,000,000.00;

(b) economic damages in an amount in excess of $1,000,000.00;

(c) Such other equitable, injunctive and other relief that this court deems

appropriate, including but not limited to attorneys' fees and cost.

**COUNT III**
**WRONGFUL TERMINATION**
**<u>Defendants UDC and Board</u>**

68. Plaintiff adopts and incorporates the allegation of complaint paragraphs 1-67 as if

fully set forth herein.

69. Defendant illegally terminated Plaintiff in violation of the Merger Agreement,

Faculty Handbook and D.C. law.

70. Neither Defendant Sessoms nor Provost Ken Bain ("Bain") had legal authority to

approve or disapprove Plaintiff's tenure and promotion applications or to terminate

her after illegally denying her tenure.  .

71. As a result of the aforementioned actions, Defendants terminated Plaintiff in

violation of applicable law.

72. As a result of Defendant UDC's actions, Plaintiff has suffered significant

emotional and mental distress and economic losses, including loss salary and

benefits, loss of employment opportunities, and damage to her professional

reputation.

**WHEREFORE**, Plaintiff requests that this Court grant the following relief against

Defendant::

(a) compensatory damages in a amount in excess of $1,000,000.00;

(b) economic damages in an amount in excess of $1,000,000.00;

(c) Such other equitable, declaratory, injunctive and other relief that this

court deems appropriate, including but not limited to  reinstatement,

back pay, an order  that the Board of Trustees consider Plaintiff's
tenure application, front pay where appropriate, and attorneys' fees
and cost.

## COUNT IV
## VIOLATION OF DC HUMAN RIGHTS ACT
## RACE AND GENDER DISCRIMINATION

73.  Paragraphs 1 through 72 are fully incorporated as if set forth full herein.

74. As an African-American woman, Plaintiff is a member of a protected class.

75. Defendant UDC discriminated against Plaintiff when its Provost and President
illegally considered her tenure application, when its President denied her tenure
and a promotion to full professorship based upon a racially and gender biased
double standards, and when its Board sanctioned the President's actions while
simultaneously approving a similarly situated white male law professor's tenure
and full professor application based upon less stringent tenure criteria. The
University effectively applied one set of tenure criteria to Plaintiff and another set
of tenure criteria to a similarly situated white male law professor.

76. Plaintiff's tenure and promotion application were unjustly delayed and denied.
Said actions were sanctioned by the UDC Board which failed to monitor this
tenure development and when being apprised failed to take any corrective action.
As such, it allowed and encouraged its President to act in violation of the law and
the University and the District of Columbia's anti-discrimination laws.

77. As a result of Defendant's actions, Plaintiff has suffered significant mental
emotional and economic harm, including loss wages, front and back pay, lost
benefits and interests thereupon.

**WHEREFORE,** Plaintiff respectfully requests this court to enter judgment for her and against Defendants, and:

(a)     Award compensatory and economic damages against Defendant in amount in excess of $2,500,000.00, plus interest thereon;

(b)     Award equitable and declaratory relief, including reinstatement, an order  that the Board of Trustees consider Plaintiff's tenure application, and that  Defendant UDC and its Board of Directors act in accordance with the law;

(c)     Award back pay with interest, front pay, attorney's fees, and such other relief against Defendant as this Court deems just and appropriate.

## COUNT V
## VIOLATION OF 42 U.S.C. § 1981

78. Paragraphs 1 through 77 are fully incorporated as if set forth full herein.

79. Defendant UDC and its Board denied Plaintiff the same right to make and enjoy her employment contract and the benefits thereof as enjoyed by white employees, including equal and unbiased consideration of tenure and full professorship. Defendants' actions violate the equal protection clause of the 14th Amendment as pronounced in 42 U.S.C. Section 1981, as amended.

80. As described above, Defendants intentionally and maliciously imposed an illegal process and an illegal double standard upon Professor Brown as described above. The Interim Provost and University President acted in violation of the law and  in violation of Defendant UDC's antidiscrimination policies and procedures, thereby establishing an illegal  policy and custom by its failure  to enforce its anti-

discrimination policies and laws.  Further the University,its Board and its President acted with deliberate indifference relative to Plaintiff's civil rights.

81. The UDC Board, with deliberate indifference, sanctioned its President and Provost's erroneous interpretation of the law and  illegal policy and custom by allowing them to act in defiance of applicable law.

82. Further, President Sessoms, a policy maker within the University and a policy decision maker in other respects, acted pursuant to an illegal policy and practice, one which was embraced by him and the law school Dean, to wit, that exercising final authority over Plaintiff's and others  law school tenure applications.

83. Plaintiff would not have suffered interference with the enjoyment of her employment contract and ensuing victimization but for Baxter's and/or President Sessoms's racially biased double standard and illegal actions.

84. Plaintiff suffered significant mental and emotional harm, as well as loss wages, benefits, and interests thereupon as a result of Defendants' actions.

**WHEREFORE,** Plaintiff respectfully requests this court to enter judgment for her against Defendants as follows:

(a)     Award compensatory and economic damages against Defendants in amount in excess of $1,000,000.00, plus interest thereon;

(b)     Award equitable and declaratory relief, including reinstatement, an order  that the Board of Trustees consider Plaintiff's tenure application and that Defendants act in accordance with the law;

     (c)    Award back pay with interest, front pay, attorney's fees, and such other relief against Defendants as this Court deems just and appropriate.

## COUNT VI
## NEGLIGENT SUPERVISION

85.  Plaintiff incorporate paragraphs 1-84 as if fully set forth herein.

86. Defendant UDC through its Board  is required to follow applicable law in its governance of UDC, including ensuring that its President and Provost act in accordance with the laws of the District of Columbia.

87. Further, the Board is required to ensure that management protects and respects the contract rights of its employees, herein Plaintiff, as a member of the DCSL and her contractual rights to be considered for tenure and a full promotion.

88. Defendant Board of Trustees failed to properly monitor the law school tenure review process and to enforce applicable law and its well known policies and procedures relative to law school tenure applications, to wit, exercising final approval thereof.   Rather, it allowed the University President to   interpret applicable law regarding the range and legality of his authority.   The Board also failed to conduct appropriate due diligence on the legal issue, which would have revealed that President Sessoms' view of  his legal authority was erroneous and that final approval over law school tenure applications rest exclusively with  the Board.

89. Further, the Board failed to supervise and monitor its President and then Interim Provost to ensure that they acted in accordance with its stated anti-discrimination policies and procedures, and its tenure and promotion policies, procedures and practices.

90. Finally, the University failed to monitor the Law School's tenure practices to ensure that they  complied with its Handbook and the Merger Agreement, subject to applicable D.C. Municipal Regulatons.   Indeed, the UDC and its Board were subject to the enforcement of applicable laws and policies.

91. As a result of Defendant UDC and its Board of Trustee's negligent supervision of its administration, Plaintiff suffered physical and emotional harm, extreme embarrassment, humiliation and mental anguish.

**WHEREFORE** Plaintiff respectfully request that this court enter judgment for Plaintiffand against Defendant District as follows:

(a) Award compensatory damages against Defendant UDC and its Board of Trustees for the claims asserted hereunder, in an amount to be determined at trial, but in any event not less than $1,000,000.00, plus interest;

(b)  Award Plaintiff the costs of this suit, including reasonable attorney's fees; and

(c)  Such other relief as this Court deems just and proper.

## COUNT VII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### All Defendants

92.  Paragraphs 1-91 are incorporated herein as if fully set forth.

93. At all times referenced herein, Defendant Sessoms acted in an unreasonably hostile and insensitive manner toward Plaintiff, including among other things, holding her to higher standards than that which is stated in the Handbook, treating her differently than other similarly situated non-minority applicants, unreasonably

delaying consideration of her tenure and promotion and, upon information and belief, relying on sources of information about Plaintiff outside of the FERC process.

94. Although Plaintiff followed the FERC process, she was considered for tenure based upon factors which were neither discussed with her nor with the FERC.

**WHEREFORE** Plaintiff respectfully prays this Honorable Court enter judgment against Defendants jointly and severally as follows:

(a) compensatory damages in a amount in excess of $1,000,000.00;

(b) economic damages in an amount in excess of $1,000,000.00;

(c) Such other equitable, injunctive and other relief that this court deems appropriate, including but not limited to attorneys' fees and cost.

**Jury Trial Demanded**

Respectfully submitted,

*Donald M. Temple*
Donald M. Temple, Esq. (#408749)
1229 15th Street, NW
Washington, DC 20005
(202) 628-1101 Phone
(202) 628-1149 Fax
dtemplelaw@gmail.com